# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JAMES MAGOLETTA GREEN, # 339719 | * | |
| Plaintiff, | * | |
| v | * | Civil Action No. JFM-13-691 |
| CORRECTIONAL MEDICAL SERVICES, INC. | * | |
| Defendant | * | |

## MEMORANDUM

Self-represented plaintiff James Magnoletta Green is suing Corizon, Inc., ("Corizon"), formerly known as Correctional Medical Services, Inc., in this prisoner civil rights action filed pursuant to 42 U.S.C. § 1983. Defendant, by its counsel, has filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (ECF No. 22). Green was notified that Corizon's response will be treated as a motion for summary judgment (ECF No. 23) and granted additional time to file an opposition with materials in support pursuant to *Roseboro v. Garrison*, 528 F.2d. 309 (4th Cir. 1975). Green has filed oppositions (ECF Nos. 24 and 27) to which Defendant has responded (ECF 25). The matter is fully briefed and a hearing is unnecessary. *See* Local Rule 105.6 (D. Md. 2011). For reasons to follow, Corizon's motion for summary judgment will be granted.

## BACKGROUND

### A. Plaintiff's Allegations

Green, who is an inmate at the Maryland Correctional Institution-Hagerstown (MCI-H), claims he was provided inadequate medical treatment by Corizon, the contractual health care

provider at MCI-H.[1] (ECF No. 1 at 3). Green is seeking compensatory and punitive damages totaling $7.5 million.

On September 9, 2011, Green submitted a sick call slip for complaints of vomiting, stomach problems, loss of appetite and weight, dizziness, fatigue, breathing problems, and "flu-like" symptoms. (ECF No. 1 at 4, ECF 24 at 2). Green states that by the time he was seen by a health provider on September 13 or 14, 2011, he told the provider he had developed a "bloody cough."[2] Green claims the medical department refused to see him for approximately the next two weeks. (ECF No. 24 at 2). On September 23, 2011, "Nurse Debbie" conducted a "glance-over" examination, informed Green that he had bronchitis, and sent him back to his housing unit. (ECF 1 at 4; ECF 26 at 1-2).[3] Green faults the health providers for being "focused [sic] on my sickness being bronchitis," noting the "staff failed miserably in securing me immediate treatment or a proper diagnosis." (ECF No. 26 at 2). On September 26, 2011, Sgt. William Vinson, the tier officer, became concerned about Green's condition and had him "carted" up to the medical department. (ECF No. 4 at 2-3). Green has submitted an affidavit executed by Sgt Vinson, which states in part:

> I was the officer on duty at the North Dorm Housing Unit during the approximate 2 weeks in question, between 9/14/11 through 9/26/11. Upon my noticing the rapid deterioration of Mr. James Green i.d. # 339-719, I on several occasions

---

[1] Corizon's contract with the State of Maryland ended on June 30, 2012. Corizon provided no medical care to Green after the termination of the contract. (ECF No. 22 at 22, Exhibit 1 ¶ 27).

[2] Green later identifies his initial health providers as Nurse Robert Schwartz and Nurse Deborah Jagoe. (ECF No. 26). On December 24, 2013, Green filed a motion to amend the complaint to add Robert Schwartz and Deborah Jagoe as defendants (ECF 32). For reasons set forth in this memorandum, Green's allegations against Schwartz and Jagoe do not amount to claims of constitutional dimension. Thus, the court finds it would not further the interests of justice to amend the complaint to add these individuals as defendants. *See* Fed.R.Civ.P. 15(a) (providing a party may amend its pleadings only with the written consent of the opposing party or the court's leave when justice so requires). Further, it is to be noted that Corizon has not moved for dismissal of this case on the basis of respondeat superior. *See Love–Lane v. Martin,* 355 F.3d 766, 782 (4th Cir.2004) (no respondeat superior liability under § 1983).

[3] In a later filing, Green states that he told nurses Robert Schwartz and Deborah Jagoe he "would violently cough" at night. (ECF No. 26 at 1).

> called the MCI-Hagerstown Infirmary out of concern for Mr. Green's health. I witnessed him coughing up blood in large clumps during that time, as well as, his difficulty breathing. Nevertheless, each time that I called he was denied access to the infirmary for whatever reasons. This happened until which time I felt as though he needed immediate medical treatment, then I had him rushed up to the infirmary despite their initial denials for the much needed and requested, medical attention, in fear for Mr. Green's life.

ECF 24 at 6.[4]

Green asserts that he was in fact suffering from a "walking pneumonia" and pulmonary embolus, and was despite his deteriorating condition denied access to proper treatment by an unnamed onsite physician and an outside medical professional[5] for two and one-half weeks after onset.[6]

On September 27, 2011, Green was admitted to Bon Secours Hospital. He was readmitted in October of 2011 for cardio-myopathy. *Id*. at 3. Green states that it was discovered that his "heart's ability to pump blood throughout my body had significantly decreased to 20% function instead of the normal 75%." Green states that his heart will never return to normal function.

   **B. Defendant's Response**

   Corizon has filed the affidavit of Sadik Ali, M.D., who was Medical Director at MCI-H in September of 2011, with verified copies of Green's medical records to support its Motion for Summary Judgment. The records show Green was initially diagnosed with pneumonia and pulmonary emboli in September 2011. He was diagnosed with cardiomyopathy with congestive

---

[4] Green filed a Complaint in the Maryland Health Claims Alternative Dispute Resolution Office (HCADRO) on or about November 19, 2012, arising out of the same events. (ECF No. 25).

[5] Green provides no additional facts in support of his allegations against the two unidentified physicians. The names of the medical providers who allegedly refused to see Green are unstated.

[6] Green does not allege Nurse Schwartz or Nurse Jaboe refused him access to medical care.

heart failure in October 2011. ECF No. 22, Exhibit 1, ¶¶ 4 and 5.[7] Dr. Ali attests that Corizon health providers appropriately referred Green to the hospital for diagnosis and emergency care during 2011 and 2012, carrying out hospital discharge instructions and obtaining the necessary follow-up consultations and referrals through utilization management. *Id*. at ¶ 5.

In his affidavit, Dr. Ali explains that cardiomyopathy is a disease that decreases the heart's ability to pump blood, and is not caused by pneumonia or pulmonary embolism. *Id*. Green's cardiomyopathy is non-ischemic; it is not caused by coronary artery disease. A patient with cardiomyopathy may have no symptoms or symptoms similar to common illnesses such as a cold or the flu. Diagnosis is typically made by physical examination, blood tests, x-ray and/or an echocardiogram. *Id*. This equipment is not available at MCI-H. Green underwent cardiac testing at Meritus Medical Center and Bon Secours Hospital during three hospital admissions in September and October 2011. *Id*. at ¶¶ 9, 10, and 12.

Green's records show that he submitted a sick call request complaining of stomach problems, shortness of breath and flu-like symptoms on September 9, 2011. (Exhibit 1 ¶ 6). On September 13, 2011, Robert Schwartz, R.N that Green indicated the onset of these problems occurred on September 9, 2011. ECF No. 22, Exhibit 2 at 303. The nurse determined Green had a cold and weakness and recommended Organidin, a cough suppressant, and Tums for his stomach. *See id*. Green was referred to a medical provider for further treatment. *Id*. at 304.

Green submitted a second sick call request for a persistent cough on September 20, 2011. (Exhibit 2 at 21). Nurse Deborah Jagoe examined him on September 23, 2011, prescribed medications for cold symptoms, and placed him on activity restrictions for three days. Green was instructed to submit a sick call request if symptoms of infection developed or his symptoms did not improve. (Exhibit 1,¶7, Exhibit 2 at 305).

---

[7] All exhibits referred to those submitted by Defendant unless otherwise indicated.

On September 26, 2011, Emily Staub, a physician's assistant saw Green for complaints of a now productive cough[8] and shortness of breath. (Exhibit 2 at 306-8). Staub prescribed codeine for the cough and admitted Green to infirmary isolation due to concerns that he might have tuberculosis or other communicable disease. *Id.* Noting that Green had lost seven pounds in two weeks, she ordered a chest x-ray and requested his transfer to the emergency room. (Exhibit 1, ¶8, Exhibit 2, at 310-1). That same day, Green was transferred to Meritus Medical Center (Exhibit 2 at 84). Green's chest x-ray results showed cardiomegaly [9] and right lung lower lobe infiltrate consistent with pneumonia. His CT angiogram of the chest revealed pulmonary emboli, consolidative changes in the right lower lobe, small reactive pleural effusion and cardiomegaly. (Exhibit 1, ¶9, Exhibit 2, at 85-86).

On September 27, 2011, Green was transferred to Bon Secours Hospital for a pulmonary consultation, where he reported he had not worn wearing protective respiratory gear several months earlier while welding. (Exhibit 2 at 170-1). Green was diagnosed with hypersensitivity pneumonitis due to inhaling soldering material, pulmonary emboli, a superimposed pneumonia and renal failure. The Bon Secours physicians recommended anticoagulation for the pulmonary embolism and antibiotics for pneumonia. (Exhibit 1, ¶10).

On September 30, 2011, Green was discharged from Bon Secours to the Metropolitan Transitional Center (MTC), where he was admitted to the infirmary to continue treatment for pneumonia, pulmonary emboli, and renal failure. (Exhibit 2 at 313). In the infirmary, he was administered the medications prescribed by his Bon Secours physicians. (Exhibit 1, ¶ 11).

---

[8] A productive cough is brings up mucus. *See* http:// www.nlm. nih.gov/medlineplus/ency/article/ 003072.htm.

[9] Cardiomegaly commonly refers to an enlarged heart seen on chest X-ray. Once identified, other tests are performed to diagnose the specific condition causing cardiomegaly. Cardiomegaly is not a disease, but rather a symptom of an underlying condition. *See* http://www.mayoclinic.org/diseases-conditions/enlarged-heart/basics/ definition.

Green was readmitted to Bon Secours Hospital on October 2, 2011, to address his test results concerning prothrombin[10] time (50.9) and INR (10.1). (Exhibit 2 at 151-2). Additionally, Green showed blood stained sputum. He received vitamin K for his abnormal INR and PT. A chest x-ray on October 3, 2011 indicated cardiomegaly. (Exhibit 2 at 161). He was discharged from Bon Secours Hospital on October 5, 2011, to MTC once he was stable. (Exhibit 2 at 218-19). Green was continued on anticoagulants and antibiotics at MTC in accordance with his discharge orders. (Exhibit 1 ¶ 12).

Green returned to MCI-H on October 12, 2011, where he was examined by Dr. Ali upon arrival. Dr. Ali's medical notes state Green had recovered from pneumonia and had an improved INR of 1.3. Dr. Ali ordered a complete metabolic panel and a follow up chest x-ray and adjusted the dosage of the anti-coagulant. (Exhibit 1 ¶13, Exhibit 2 at 353).

On October 27, 2011, Green was admitted to Bon Secours Hospital as an emergency for shortness of breath, lower extremity edema and a seven pound weight gain in two weeks. (Exhibit 2 at 99). He was diagnosed with cardiomyopathy with congestive heart failure and abnormal coagulopathy. During this hospital admission, Green first reported to medical providers his significant family medical history of cardiac problems; he indicated that his mother at the age of 51 and was thought to have heart disease. (Exhibit 1 ¶14; Exhibit 2 at 109-111).

On October 28, 2011, the cardiologist who examined Green wrote in the medical chart that "my guess is that the pneumonia may actually have been congestive heart failure… It is also not clear what the evidence is that he had a pulmonary embolus." Green's coumadin[11] was

---

[10] Dr. Ali explains in his affidavit that prothrombin time (PT) is a blood test that measures the time it takes for the liquid portion (plasma) of the blood to clot. "PT is done at a regular interval for patients receiving anti-coagulation therapy. Results are often presented as a ratio or "NR." A desired PT range for most patients receiving anti-coagulation is 2.0 to 3.0.

[11] Coumadin (warfarin) is a medicine prescribed for people at increased risk of forming blood clots. To help Coumadin work effectively, vitamin K intake must be kept consistent. *See* http://ods.od.nih.gov/pubs/factsheets/

stopped. Green was started on beta blockers[12] and cardiac catherization was recommended. (Exhibit 2, at 111-113). The medical notes read, "[i]f he does not improve symptomatically, or if the ejection fraction fails to improve, at some point a defibrillator or biventricular pacemaker will need to be considered." (Exhibit 1 ¶15, Exhibit 2 at 111-3).

On October 29, 2011 a cardiologist at Bon Secours recommended cardiac catheterization, after Green's INR dropped to 1.5. Green was undecided about undergoing cardiac catheterization at the time, and was discharged from Bon Secours on November 2, 2011 and admitted to the MTC infirmary until his INR dropped to the desired range. (Exhibit 1, ¶16; Exhibit 2, at 114-115).

On November 7, 2011, Green returned to Bon Secours for cardiac catheterization after his INR dropped to 1.2. No blockages were found during the procedure. He was diagnosed with non-ischemic cardiomyopathy with a poor left ventricular ejection fraction of less than 20%. (Exhibit 2 at 89-90). Green was discharged on the same day. (Exhibit 1 ¶17; Exhibit 2 at 93-94).

On November 8, 2011, Corizon medical provider Dr. Ayalew examined Green and discussed the results of the cardiac catheterization. Dr. Ayalew ordered that Plaintiff could return to MCI-H and his medications resumed, including coumadin. (Exhibit 2 at 89-90). Dr. Ayalew ordered a follow-up appointment for Green with cardiologists at Bon Secours Hospital. (Exhibit 1 ¶18; Exhibit 2 at 89-90).

On November 11, 2011, P.A. Emily Staub at MCI-H wrote on Green's medical chart that he was approved for cardiology follow up. (Exhibit 2, at 391 and 394). She contacted Dr.

---

coumadin1.pdf.

[12] Beta blockers are a type of drug used to treat high blood pressure. *See* http://www.nlm.nih.gov/medlineplus/ency/article/002578.htm.

Morgan, an outside cardiologist, on November 15, 2011, and confirmed discontinuing Green's coumadin. (Exhibit 1 ¶19, Exhibit 2 at 390, 392).

Dr. Yahya examined Green at MCI-H on November 15, 2011, restarted anti-coagulant therapy, and ordered follow-up in the chronic care clinic. (Exhibit 2 at 393). Green was seen by various physicians and nurses at MCI-H for prothrombin time and INR with adjustments to his anticoagulant dosage on November 23, 2011, December 1, 2011, December 7, 2011, December 16, 2011, and December 26, 2011. (Exhibit 1 ¶ 20; Exhibit 2 at 396-401, 409-10, 417).

On December 12, 2011, Dr. Morgan, a cardiologist at Bon Secours, examined Green. (Exhibit 2 at 407-8). P.A. Staub wrote that Dr. Morgan "will wait for another 6 months until a defibrillator implant is placed." (Exhibit 2 at 407). P.A. Staub requested scheduling a cardiology follow-up appointment with Dr. Morgan for two to three months later. (Exhibit 2 at 405, 407-8). Staub discussed Green's care again with Dr. Morgan on December 19, 2011. (Exhibit 2 at 413). Dr. Morgan recommended maximizing Green's medical treatment before considering a defibrillator. *Id*. Staub also requested a cardiac ECHO[13] from utilization management on December 19, 2011, in accordance with Dr. Morgan's recommendations. The procedure was approved on December 21, 2011. (Exhibit 1 ¶ 22, Exhibit 2 at 411-12).

Plaintiff was examined in the MCI-H Chronic Care Clinic on December 20, 2011. He exhibited no apparent distress and improving cardiomyopathy. (Exhibit 1 ¶23, Exhibit 2 at 415). On January 24, 2012, Dr. Ali evaluated Green, who had requested a medical parole. (Exhibit 2 at 418). Dr. Ali found few signs and symptoms of disease, assessing Green's overall condition as stable despite his heart condition. Green did not satisfy the criteria for medical parole and was so advised. (Exhibit 1 ¶24, Exhibit 2 at 19, 418).

---

[13] An echocardiogram is a test that uses sound waves to produce live images of the heart, allowing doctors to assess how the heart and its valves are functioning. An echocardiogram is also referred to as "echo." *See* http://www.healthline.com/health/echocardiogram.

On March 13, 2013, Green was evaluated again by Dr. Morgan at Bon Secours on March 13, 2012. Exhibit 2 at 422. His ejection fraction had improved to 25-35%. Exhibit 2 at 423. Dr. Morgan recommended another cardiology consultation in three to four months.[14] Green was seen in the Chronic Care Clinic at MCI-H with improving symptoms through the end of Corizon's contract with the State of Maryland on January 27, February 27, March 30, and June 14, 2012. (Exhibit 1 ¶26, Exhibit 2 at 419-20, 424, 427).

## STANDARD OF REVIEW

Because matters outside the pleadings will be considered, defendant's motion shall be treated as a motion for summary judgment. Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion: "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original). "The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must set forth specific facts showing that there is a genuine issue for trial." *See Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *See Dennis v. Columbia Colleton Medical Center., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002). The

---

[14] As earlier noted, Corizon's state contract ended on July 1, 2012.

court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *See Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing, 477 U.S. 317, 323-24 (1986)).

## DISCUSSION

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *See Gregg v. Georgia*, 428 U.S. 153, 173 (1976). To state an Eighth Amendment claim for denial of medical care, plaintiff must demonstrate that the actions of defendants (or their failure to act) amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, plaintiff was suffering from a serious medical need and that, subjectively, the prison staffs were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As noted above, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry. The second component of proof requires "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839–40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted

punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995), quoting *Farmer,* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris* 240 F. 3d 383 (4th Cir. 2001), citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken). Disagreement over the course of treatment does not provide the framework for a federal civil rights complaint, *see Russell v. Sheffer*, 528 F. 2d 318 (4th Cir. 1975); *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (stating "[d]isagreements between an inmate and a physician over the inmate's proper care do not state a § 1983 claim unless exceptional circumstances are alleged") and mere negligence or malpractice does not rise to a constitutional level. *Russell,* 528 F. 2d at 319; *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986).

Green's medical records demonstrate that he has received continuous medical treatment for his serious medical needs. At the outset of his symptoms, medical providers treated him for what was initially believed to be flu-like symptoms or a cold, including a cough. When his symptoms worsened, Greene was sent to the hospital for emergency care. Corizon medical providers continued to treat Green after his diagnoses, followed hospital discharge instructions, regularly monitored his prothrombin time and INR until anticoagulation was discontinued, and arranged for his follow-up cardiology consultations. Meanwhile, medical practitioners continued to follow-up Green in the MCI-H Chronic Care Clinic.

Under these circumstances, judged in the light most favorable to Green, he fails to show defendant acted with requisite deliberate indifference to his serious medical needs. Even when

the facts are viewed in the light most favorable to Green, there is no genuine issue of material fact in dispute. The evidence is that the Green's complaints were evaluated and treated. When his initial flu-like symptoms progressed, he was seen and sent for emergency care and specialized consultations. His care was managed at MCI-H pursuant to hospital discharge instructions and the recommendations of cardiologists. In short, Green's allegations of fact and the record before this court do not show his medical treatment was provided with deliberate indifference to his serious medical needs.[15] According, Corizon is entitled to summary judgment as a matter of law.

## CONCLUSION

Having determined no genuine issue of material fact is in dispute in this matter, the court shall grant defendant's motion for summary judgment by separate order to follow.

 March 19, 2014      /s/
Date      J. Frederick Motz
     United States District Judge

---

[15] Of course, by so ruling this court expresses no opinion as to the merits of Green's state law claims. To the extent Green raises any state claims in the instant action, the court declines to exercise supplemental jurisdiction.